JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

JOSHUA FERENC, Individually, and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

E*TRADE FINANCIAL CORPORATION, MITCHELL H. CAPLAN and ROBERT J. SIMMONS,

Defendants.

</td><td>

**07 CV 10540**
No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

</td></tr>
</table>



NOV 21 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Joshua Ferenc ("Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by E*TRADE Financial Corporation ("E*TRADE" or the "Company") from April 20, 2006 through November 9, 2007, inclusive (the "Class Period"), by his undersigned attorneys, for his Complaint, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on his investigation (made by and through his attorneys), which investigation included, among other things, a review and analysis of: (1) public documents pertaining to E*TRADE and the other defendants; (2) E*TRADE filings with the Securities and Exchange Commission ("SEC"); (3) press releases published by E*TRADE; (4) analyst reports concerning the Company; (5) newspaper and magazine articles (and other media coverage) regarding E*TRADE, its business or any defendant. Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their custody and/or control. Plaintiff believes that

further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action brought on behalf of all purchasers of E*TRADE publicly traded securities during the Class Period, which securities were artificially inflated as a result of defendants' dissemination of false and misleading statements and deceptive acts concerning:  (a) the failure to disclose risks that were inherent in its new business model in which E*TRADE diverted from its traditional discount stock brokerage business and entered the banking business, concentrating on, among other things, mortgages and home equity loans; and (b) E*TRADE's subsequent failure to accurately account for and value its mortgage loan portfolio.

2.    E*TRADE started to deviate from its traditional brokerage business model in or about 2003 when the housing boom was in full swing.  As a result of the Company's expansion into lending, a majority of E*TRADE's recent revenue growth has been driven by its mortgage assets.  By 2006, the Company derived about 58% of its revenues from net interest earned on its loan portfolio, while brokerage commissions and revenue from primarily market making transactions accounted for only about 30% of revenue.

3.    During this transition period, E*TRADE orchestrated a massive scheme designed to conceal an enormously risky and unsound subprime mortgage portfolio.  As the subprime market began to unravel in 2006 and continue its plunge into 2007, E*TRADE failed to increase its level of provision for loan losses, as is required under Generally Accepted Accounting Principles ("GAAP"), because Defendants knew this would be detrimental to earnings.

4.      Throughout the Class Period, despite the housing correction becoming more severe each quarter with reports of increased delinquencies and foreclosures, E*TRADE failed to make any of the necessary adjustments to its reserve for loan losses or to its level of charge-offs for the substantial mortgage portfolio that it was holding in its efforts to prop-up its overall earnings in light of its sagging brokerage business. Remarkably, E*TRADE increased its earnings guidance despite the abundant warning signs of impending problems in the subprime housing market. While E*TRADE made generic statements about increased risk from its loan operations, it wholly failed to adequately disclose the devastating effects that even slight value reductions to its mortgage portfolio would (and eventually did) have on the Company's earnings and balance sheet.

5.      As the truth about the actual risks and true value of E*TRADE's various mortgage backed securities were revealed to the market, E*TRADE has been forced to incur massive write downs of the value of its mortgage backed assets held on its balance sheet.

6.      Beginning on July 25, 2007, E*TRADE began to reveal some of its exposure to the subprime housing market (*i.e.*, mortgage loans to borrowers with lesser creditworthiness) announcing that its costs for bad loans almost tripled. But, the disclosures would get far worse. On September 17, 2007, E*TRADE finally began to reveal the real extent of its subprime exposure. After the close of the market, E*TRADE announced that it was exiting the wholesale mortgage business and revising its 2007 earnings guidance to account for higher provision for loan losses, potential securities impairments, reduced balance sheet growth and restructuring charges and slashed its

3

earnings guidance for future periods. As a result of these disclosures, E*TRADE's stock price was down more than 35% during the period between the July 2007 announcement and the September 2007 disclosure. Thereafter, during September, 2007, the stock price hovered in the $13 range.

7.    Late on Friday, November 9, 2007, E*TRADE announced that further deterioration in its mortgage-backed securities portfolio would lead to larger than expected write-downs in the fourth-quarter of 2007, withdrew its earnings guidance and reported that the SEC had commenced an investigation. The stock plummeted from a close of $8.59 on November 9 to $3.55 on Monday, November 12, 2007, a drop of 58.67% on extremely heavy trading volume of over 303 million shares, which is roughly 30 times normal trading volume. Since July, 2007, the stock has dropped from over $20 to $3.55, representing a loss of nearly $8 billion in market capitalization.

### JURISDICTION AND VENUE

8.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9.    This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

10.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391. Many of the acts and practices complained of herein, including the misrepresentations and schemes alleged herein, occurred in substantial part in this District, and E*TRADE's principal executive offices are located in this District.

11.    In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the United States' mail, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

12.    Plaintiff, Joshua Ferenc purchased E*TRADE common stock on the open market during the Class Period at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants. Plaintiff's purchases of E*TRADE common stock are set forth in the attached certification. When the truth about E*TRADE's true financial condition was disclosed, Plaintiff suffered damages when E*TRADE's stock price lost substantial value.

13.    Defendant E*TRADE is a global financial services company offering a wide range of financial services to retail and institutional customers. It has numerous subsidiaries, including E*TRADE Bank, a federally chartered savings bank, and E*TRADE Capital Markets, LLC, a registered broker-dealer.  The Company has approximately 4,100 employees and originally incorporated in California in 1982 and reincorporated in July 1996 under the laws of the State of Delaware.  The principal executive offices of E*TRADE are located at 135 East 57th Street, New York, New York. E*TRADE's common stock is traded on NASDAQ under the symbol "ETFC."

14.    Defendant Mitchell H. Caplan ("Caplan") is and was at all relevant times the Chief Executive Officer of E*Trade.  Caplan has been CEO and a director on the E*TRADE board of directors since 2003.  Caplan is also Chairman of the board of directors of ETB Holdings, Inc., the holding company for E*TRADE Bank, and Chairman of the board of directors of E*TRADE Bank.  Caplan received both a law degree and masters in business administration from Emory University.  In 2006, Caplan received $750,000 in salary, $1,724,928 in stock awards, $2,612,943 in option awards

5

and total compensation of $9,945,506. During the Class Period, Caplan signed false and misleading SEC filings and knowingly issued false statements about E*TRADE's financial health.

15.     Robert J. Simmons ("Simmons") is and was at all relevant times the Chief Financial Officer ("CFO") of E*Trade. Simmons became CFO in January 2004 and has held that role since then. According to the Company's 2007 proxy statement, Simmons is "co-author of an article addressing financial disclosure issues titled, "Killing Trickle-Down Investor Relations with Technology." In 2006, Simmons received $500,000 in salary, $374,143 in stock awards, $609,917 in option awards and total compensation of $3,157,605. During the Class Period, Simmons signed false and misleading SEC filings and knowingly issued false statements about E*TRADE's financial health.

16.     Defendants Caplan and Simmons are sometimes referred to hereinafter as the Individual Defendants. The Individual Defendants and E*TRADE are collectively referred to herein as the "Defendants."

## CONTROL PERSON ALLEGATIONS/GROUP PLEADING

17.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about E*TRADE, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through E*TRADE's internal corporate documents, conversations and connections with other corporate officers, analysts, marketing executives, and conversations and connections with the Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as E*TRADE's officers and directors.

18.    It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

19.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

20.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's

publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

22.    Each of the Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities. Throughout the Class Period, Defendants disseminated materially false and misleading statements and suppressed material adverse facts about E*TRADE.

## DEFENDANTS' FRAUDULENT CONDUCT

23.    E*TRADE provides brokerage and banking services, including trading, investing, banking, and lending to retail, corporate, and institutional customers. It rose to prominence as a low-cost, electronic brokerage company.

24.    Over the last several years, E*TRADE has greatly expanded its banking business, both organically and through a series of acquisitions, with a goal of becoming a primary destination for all its customers' financial needs. The Company's diversification into banking was an attempt to make it less reliant on volatile commission revenue from its brokerage arm and allowed it to capture a greater share of its customers' assets. To

that end, the Company offers a comprehensive set of financial services, including mortgages and home equity loans.

25.     As a result of the Company's expansion into lending, a majority of E*TRADE's recent revenue growth has been driven by its mortgage assets. The Company derived about 58% of its revenues from net interest on its loan portfolio in 2006, while brokerage commissions and principal transactions (*i.e.*, transactions that primarily consist of revenue from market making activities) accounted for only 30% of revenue. During the Class Period, the Company held a large portfolio of mortgage-backed securities. As of June 30, 2007, E*TRADE had a $28 billion mortgage portfolio.

**E*TRADE's Accounting For Real Estate Loans**

26.     During its expansion and indeed throughout the Class Period, E*TRADE's quarterly and annual financial reports filed with the SEC stated that it has policies and procedures in place to mitigate risk and accurately report the health of its business, including policies related to accounting for its real estate loan portfolio.

27.     Regarding allowance for loan losses, the Company stated the following:

The allowance for loan losses is management's estimate of credit losses inherent in our loan portfolio as of the balance sheet date. The estimate of the allowance for loan losses is based on a variety of factors, including the composition and quality of the portfolio; delinquency levels and trends; probable expected losses for the next twelve months; current and historical charge-off and loss experience; current industry charge-off and loss experience; the condition of the real estate market and geographic concentrations within the loan portfolio; the interest rate climate as it affects adjustable-rate loans; and general economic conditions.

\*          \*          \*

In general, *we believe the allowance for loan losses should be equal to at least twelve months of probable projected losses for all loan types.*

(Emphasis added.)

28.    In connection with the Company's method of valuing securities, the Company has stated during the Class Period:

> Impairment of mortgage-backed or asset-backed securities is recognized when management estimates the fair value of a security is less than its amortized cost and if the current present value of estimated cash flows has decreased since the last periodic estimate. If the security meets both criterion, we write the security down to fair value in the current period. We assess securities for impairment at each reported balance sheet date.

29.    Throughout the Class Period, therefore, E*TRADE was aware of its obligation and duty under GAAP to increase its level of provision for loan losses if the overall economy weakens and that any addition to this allowance or any increase in the level of charge-offs the Company takes would be detrimental to its earnings. Thus, the Company has explained in a regulatory filing:

> To the extent we continue to diversify our asset portfolio through purchases and originations of higher-yielding asset classes, we will have to manage assets that carry a higher risk of default than our mortgage portfolio. Consequently, the level of charge-offs associated with these assets may be higher than what we have previously experienced given our asset mix. In addition, if the overall economy weakens, we could experience higher levels of charge-offs. If expectations of future charge-offs increase, a corresponding increase in the amount of our allowance for loan losses would be required. The increased level of provision for loan losses recorded to meet additional allowance for loan losses requirements could adversely affect our financial results, if those higher yields do not cover the provision for loan losses.

30.    As these and other disclosures make clear, the Company told shareholders it had methods of accounting for its mortgage portfolio that relied on management's judgment, but also on other elements such as the state of the real estate market and delinquency levels. In addition, a key component to its allowance for loan losses was to consider probable expected future losses. This was critical to shareholders who purchased during the Class Period because in or around early 2006, it was widely known that a severe downturn in the housing industry had begun. During the Class Period,

10

despite the housing correction becoming more severe each quarter with reports of increased delinquencies and foreclosures, E*TRADE failed to make any of the necessary adjustments to its reserve for loan losses or to its level of charge-offs for the substantial mortgage portfolio that it was holding in its efforts to prop-up its overall earnings in light of its sagging brokerage business. In addition, while E*TRADE made generic statements about increased risk from its loan operations, it wholly failed to adequately disclose the devastating effects that even slight value reductions to its mortgage portfolio would have on the Company's earnings and balance sheet.

## False and Misleading Disclosures During the Class Period

31.     Despite the severe downturn in the housing market in early 2006, E*TRADE raised its earnings guidance in an April 19, 2006 press release reporting its first quarter 2006 results. The press release trumpeted net income of $142 million and reflected that net interest income after provision for loan losses increased 79 percent to $315 million – representing 53 percent of total net revenue. The Company also raised its 2006 earnings guidance range to $1.35 to $1.50 per share from the previous range of $1.30 to $1.45.

32.     In the press release, Caplan stated:

Our operational focus and financial discipline continue to drive increased customer engagement and unlock the full value of our integrated model. Given the strength of our first quarter results and the growth rates in customer cash, credit and assets, we are raising our 2006 earnings outlook today. Having completed the conversion of Harrisdirect and as we prepare to convert BrownCo in early May, we remain extremely encouraged by the trends we are experiencing with respect to economic attrition from these new customers. We will provide further updates to our earnings outlook in July or as we see necessary.

33.    No mention of E*TRADE's subprime exposure or the effect it could have on E*TRADE's earnings was made.

34.    In a conference call with analysts on the same day, Simmons stated:

During the quarter we remained focused and disciplined in executing our core strategic plan, while accelerating that plan through the integration of our recent acquisitions. This combination not only produced record revenue and earnings but also record results across many of the key drivers of our business. First-quarter total net revenue increased 43% year-over-year and 25% sequentially to a record $598 million. Net interest income after provision increased 79% year-over-year and 30% sequentially to a record $315 million.

As we have achieved great balance sheet integration over the past year, we have more effectively monetized the growth in customer cash and credit balances. As a result, net interest income has become a larger portion of a growing revenue base and now represents 53% of revenue, up from 42% a year ago.....

Rather than originating and selling loans, we have improved the customer experience by putting more origination volume on balance sheet. This allows us to retain the customer relationship while driving growth in spread-related revenue. The shift away from gain on sale has favorably impacted the overall quality of our earnings. Our model is designed to generate a growing base of recurring revenue as customers engage in assets, cash and credit solutions. As witnessed in the first quarter, our model also maintains strong leverage to growth in trading activity.

35.    The stock closed at $26.86 on April 19, 2006.

36.    On July 19, 2006, E*TRADE announced record results for its 2006 second quarter reporting net income of $156 million and reflected that net interest income after provision for loan losses increased 71% to $334 million – representing 55% of total net revenue. The Company also raised its earnings guidance for a second time in 2006 to a range of $1.42 to $1.52 per share from the previous range of $1.35 to $1.50.

37.    In the press release, Caplan stated:

The strength of our second quarter results demonstrates the flexibility of our model, particularly amid an environment filled with significant

macroeconomic uncertainty. As retail customers respond to the market environment, they are increasingly looking for value from a broader set of financial solutions. Through our compelling value proposition across investing, trading, banking and lending products, we remain ideally positioned to capitalize on short-term market opportunities and long-term secular growth trends.

38.     Again, no mention of E*TRADE's subprime exposure or the effect it could have on E*TRADE's earnings was made. The stock closed at $22.41 on July 19, 2006.

39.     On October 18, 2006, after the close of the market, E*TRADE announced results for its 2006 third quarter reporting net income of $153 million; the press release reflected that net operating interest income after provision for loan losses increased 68% to $343 million – representing 59% of total net revenue. The Company narrowed its 2006 earnings guidance slightly to $1.45 to $1.50 per share from the previous range of $1.42 to $1.52 per share.

40.     In the press release, Caplan stated:

In the third quarter we generated growth in client assets and cash, fueled by expanded customer engagement across our suite of value-oriented financial solutions. Our success is a testament to our integrated business model, which delivers quality results through various market conditions. As we expand globally by exporting our proven US value proposition to our international locations, we are extremely optimistic about the long-term growth potential of the franchise.

41.     Again, no mention of E*TRADE's subprime exposure or the effect it could have on E*TRADE's earnings was made. The stock closed at $22.80 on October 18, 2006.

42.     On December 14, 2006, E*TRADE had a conference call with analysts at which Caplan discussed the Company's earnings guidance. During the call, Caplan stated in pertinent part:

We have long said that we define ourselves as a growth Company based on our ability to generate annual revenue growth of 10% to 15%, earnings growth of 15% to 20%, with an operating margin approaching 50%. From our current inflection point, the Company is positioned to not only meet, but exceed those growth targets in 2007. Based off the current 2006 consensus revenue and GAAP EPS estimate, the annual guidance we establish today reflects revenue growth of 14% to 24% from the low to high end of the range, GAAP EPS growth of 15% to 26%, with an annual operating margin of 47%. Most importantly, we expect to deliver these strong results even as we make additional investments in marketing and service.

43.    On January 18, 2007, the Company issued a press release announcing financial results for year end and the fourth quarter of 2006. Net income for the fourth quarter was $177 million and total year-end revenue was reported at $629 million. Caplan stated:

In 2006 the Company delivered a fourth consecutive year of record results while successfully integrating two key acquisitions and strategically investing in product, service and marketing to strengthen the future performance of the franchise. As a result of this success, we enter 2007 ideally positioned to capitalize on the secular growth trends of the industry, and we will continue to seek out targeted investments to build stronger client relationships and drive broader product engagement in the US and abroad.

44.    No mention of subprime concerns was made. On January 18, 2007, the stock closed at $24.71.

45.    On April 18, 2007, the Company issued its earnings release for the first quarter of 2007. The Company reported net income of $169.4 million and total net revenue of $645 million. Caplan stated:

We are extremely pleased with the response to our marketing and service investments this past quarter which generated record net new accounts, with continued strong growth in our target segments, and record levels of customer assets and cash. The success we are seeing in attracting and retaining high-value customers is clearly beneficial to the long-term growth of the franchise.

Although the broad based markets have been strong, the recent volatility in the macroeconomic environment has affected retail customer behavior and engagement levels. As a result, we are reducing our 2007 earnings estimate to better reflect the muted retail environment we are now experiencing as compared to our expectations at the end of 2006."

46.     Again, however, there was no mention of subprime concerns.

47.     O April 18, 2007, the Company held a conference call with analysts during which E*TRADE's loan portfolio was discussed. Caplan stated in pertinent part:

> With much having been reported about rising delinquencies and default rates among subprime asset portfolios, we also recognize that we are operating in a changing credit environment. Given our historic and continued strict discipline with respect to credit, we believe that the risk to our balance sheet is significantly mitigated compared to financial institutions with a more traditional mix of assets. We recognize that we are not immune to the current environment, and we are anticipating upward trends in delinquencies and charge-offs in our portfolio versus last year levels and even versus assumptions when we gave guidance in December.
>
> To set some context, in 2006, we booked $45 million in provision for loan losses. Embedded in our guidance for 2007 last December, we forecasted an increase in our provisions of 51% to $68 million or to approximately $17 million per quarter, based both on the growth and the seasoning of our portfolio. In the first quarter, we reported $21 million of provision, an extra $4 million or $0.005 per share against earnings. We believe that this is the result of what is happening in the broader credit environment. If you annualize these trends, it translates into an additional $0.02 per share provision expense for 2007 over and above what was embedded in our original guidance. Exercising prudence and for guidance purposes, we are assuming provision expense of $96 million for the year or quarterly provision expenses of approximately $25 million for the balance of the year. This translates into $0.04 a share per headwind to our original earnings guidance for the year. This number represents a 2% reduction to the mid point of our original guidance and is relatively contained, given the benefit of the credit quality of our portfolio.
>
> Look across our $37 billion loan portfolio, over $26 billion is in one to four-family mortgages and home equity products, $7 billion is margin debt from our investing customers, and the remainder is legacy consumer loans that are in run-off mode. Across the entire mortgage portfolio, our dollar weighted average FICO score remains at a solid 735. The average loan-to-value ratio is 73% and the average debt-to-income ratio is 35%, all

numbers consistent with this time last year. In our one to four-family first lien portfolio, the average FICO is 738, LTV's averaged 68%, and DTI averages 34%. As we continue to grow our mortgage portfolio throughout this year, growth will tend to be more heavily weighted, 70% in one to four-family first lien products meeting that criteria. In second lien product, the average FICO is 732, LTV's averaged 79%, with an average DTI of 36%. *Specifically with respect to subprime loans, based on the standard industry definition of borrowers with FICO scores of 620 or below, we hold approximately $50 million of balances, or less than one-fifth of 1% of our $29 billion whole loan portfolio, a de minimis amount.*

(Emphasis added.)

48.    In response to a question from a conference call participant regarding E*TRADE's provisions for loan losses, Caplan stated:

So as I said, last year we had charge-offs as you saw of about $45 billion. We assumed, as I said in the prepared remarks -- what? $45 million, sorry. $45 million. Yes, good point. [LAUGHTER] And this quarter, as we were really building the guidance for this here, don't forget we have had pretty consistent growth in the balance sheet.  So under any circumstances, notwithstanding the fact that we have stayed completely disciplined about focusing on what we call prime and really super-prime borrowers, you're going to see an increase in charge-offs just as a result of the increasing balance sheet size.  We also assumed that, as the balance sheet, which is growing -- has been growing continues to season, you would see an uptick.  So, as we were modeling for this year last year and then gave guidance in December, we had always assumed that it would go up to the $68 million or about $17 million a quarter.  So in our model we had always presumed that that was going to be the case having nothing to do with a more difficult credit environment in any meaningful way, but simply as a result of both size of the balance sheet and seasoning of the balance sheet.

The incremental difference this quarter that we saw of the $17 million that we have expected to about $21 million we believe is the result of what's happening in the overall credit market, which is this discussion about what's happening in subprime, what's happening in Alt-A, and to the extent it that, more importantly, any of that is bleeding up into the general prime and super-prime market.  Our view I guess going forward is -- and we were trying to be prudent about this -- is that as you looked forward for the rest of this year, we could simply have said, all right, we saw a $4 million unexpected increase.  If you annualize that, it would have been somewhere in the neighborhood of $16 million or $0.02.  But we believe, given what we're seeing and what we're trying to prepare for, is the worst

case scenario absent an absolute mortgage meltdown that you'd see a lost severity trend in the small percentage of our portfolio that we discussed, literally increasing by 50%. That that's what would drive the increase of the $28million.

You know, it may not come out to bear, but I guess in our mind, given everything we're seeing, we're better off being prudent around discussing this, and then putting context around the size of the overall balance sheet and then making it being clear for the first time ever that when you look at what the market is concerned about in either subprime or all day, one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%. *So I feel pretty good when I recognize that over 99% of our whole loan portfolio is, fact in, in those products which have traditionally not been impacted in markets like this.*

(Emphasis added.)

49.     Reacting to the revised guidance, on April 19, 2007 (the next trading day), shares of E*TRADE fell mildly, by $1.04 per share, to close at $21.09 per share.

50.     The foregoing statements were false and misleading because Defendants misrepresented and failed to disclose the following facts which were either known to them or recklessly disregarded:   (a) that the Company was experiencing a rise in delinquency rates; (b) that the Company's securities portfolio, including substantial mortgage and asset-backed securities, was materially overvalued; (c) that despite the downturn in the housing industry that had begun in early 2006 and became more severe during each subsequent quarter throughout the Class Period, E*TRADE failed to make any necessary adjustments to its reserve for loan losses or to its level of charge-offs for exposure to subprime lending and securities with significant subprime exposure; and (d) that based on the foregoing, Defendants' earnings guidance respecting E*TRADE's future earnings prospects was lacking in basis at all times.

## THE TRUTH BEGINS TO LEAK OUT

51.    On July 25, 2007, the Company surprisingly announced that its profit climbed only 1.7% in the second quarter, the slowest pace in two years, as costs for bad loans almost tripled.  The Company again revised its earnings guidance for 2007.  The July 25, 2007 press release stated:

> The Company also narrowed its 2007 pro-forma earnings guidance to a range of $1.58 - $1.72 per share from the previous range of $1.55 - $1.75, leaving the mid-point of $1.65 unchanged.  This pro-forma range excludes the $0.05 per share of expense for certain legal and regulatory matters realized during the second quarter.  Including these expenses, the Company now expects to earn $1.53 - $1.67 per share on a GAAP basis in 2007.  'Our second quarter results demonstrate the strategic and economic success we have achieved through investments in product, service and marketing over the past several years,' said Mitchell H. Caplan, Chief Executive Officer, E*TRADE FINANCIAL Corporation.  'We delivered record performance in the quarter while improving the overall quality of revenue and earnings through continued growth and engagement led by our high-value, target segment accounts.'

52.    On July 25, 2007, the Company also held a conference call with analysts during which the credit quality of E*TRADE's loan portfolio was discussed.  Defendants Caplan and Simmons were involved in the following discussion:

> HOWARD CHEN [Analyst at Credit Suisse]: Okay. Finally, Mitch, just switching gears, we're now a few quarters into the launch of the loan optimizer. It seems like your margin loan balances are tracking higher. From what you can see, is at all of function of your customers shifting their leverage away from HELOCs or credit cards to margin loans or is that simply just a function of overall equity market appreciation? Put another way, are you happy with the way that the loan optimizing is progressing?
>
> MITCHELL CAPLAN: Yes, but again it is early days and so we would hope to continue to see -- has the loan optimizer been as successful as the cash optimizer? No. But again, it is early days and we expected it to take longer. When you think about the growth that we experienced in margin in this past quarter and, again, I think what we have seen so far in Q3, we think that most of that is driven, whether it is the loan optimizer or otherwise, by continued engagement within the target segment.

JARRETT LILIEN [E*TRADE's President and Chief Operating Officer]: The thing is, the loan optimizer is a good awareness tool right now and it is doing its part, but just reiterating what Mitch said, the real growth is additional accounts. It is the growth in the target segment that is driving -- drives 76% of our revenues. It grew 29% in the quarter. That is what is driving assets, cash, DARTs, and margin.

HOWARD CHEN: Okay, thanks, Jerrett. Thanks, Mitch.

ROBERT SIMMONS: Let me clarify one other point that was made earlier by Mitch. It was a question around the vintages and stuff. I think if you look at our total book as of the end of this quarter, you can see that the growth in our loan book came exclusively in one to fours and margin, which are our highest quality loan categories. If you look at our consumer and our HELOC book, they were both down. So the question with respect to vintages, we do not have zero in '06 vintages in our book. We will give you some more details when we file our Q. But just wanted to clarify that the reduction of $400 million related to our HELOC book this quarter and we would expect that sort of trend to continue.

MITCHELL CAPLAN: Right, and I guess I was responding to was what Matt [Drury], who was sitting next to me, was talking about, which is within the '06 vintage, we have zero in subprime. So I think that was the issue that I was responding to and I guess the sheet of paper that I have been seeing. *So again, our subprime quarter-over-quarter continued to stay flat and declined a bit. Then what could be thought of as subprime, I guess, in the '06 vintage is zero at this point.*

(Emphasis added.)

53.    E*TRADE's banking unit had to put aside more money to cover loans losses. The company's provision for loan losses ("charge-offs") rose to $30 million in the quarter, double the level of the year prior. In reaction to this news, E*TRADE's stock price dropped $1.41 per share from $20.46 per share on July 25, 2007, to $19.05 per share on July 26, 2007 — a 6.89% one-day drop. Over the next two weeks, E*TRADE's stock price continued to trade lower on concerns over the Company's credit exposure with E*TRADE stock price closing near $17 per share on August 10, 2007.

54.    Then, on August 12, 2007, Citigroup analyst Prashant Bhatia published a report on E*TRADE called "Credit Trends Continue to Deteriorate, Disclosure Still Lacking." The report called the Company's disclosures in its most recent 10-Q "short on substance" and stated that "management provided minimal new information on the composition, source, and quality of its $28 billion mortgage portfolio." The report pointed out that E*TRADE provided credit scores (FICO & LTV) on its average portfolio rather than on the "tails" of the portfolio, which are more relevant. The report also pointed out that E*TRADE's non-performing real estate and special mention loans rose to $561 million, or 30% of the Company's tangible book value, four times higher than a year earlier. Bhatia noted that, while charge-offs doubled to $30 million, since non-performing loans quadrupled, he believed that charge-offs should be in the $50 to $60 million range or roughly double what E*TRADE was reporting. Furthermore, he noted that if meaningful deterioration in the credit quality of the existing portfolio continues, charge-offs could approach the $100 million range.

55.    Bhatia also noted that the Company's unrealized securities losses on its $17 billion available-for-sale securities portfolio rose to $675 million, which is equal to 60% of consensus 2007 earnings estimates. In addition, he pointed to the troubling fact that the Company's reserve coverage ratio[1] for real estate loans had declined to 33%, compared to 83% a year earlier. He found the fact that this ratio would actually be cut in half during a period of major deterioration in the consumer credit environment related to mortgages to be extremely troubling. In addition, the Company's reserves compared to its total balance of real estate loans also declined when compared to the prior year.

---

[1]    A reserve coverage ratio looks at a company's reserve for loan losses compared to its nonperforming loans.

Despite one of the worst housing markets in history, E*TRADE's reserves to total loans was only 0.19%, lower than the 0.20% it had in the previous year.

56.    In response to the negative analyst report, E*TRADE's stock price declined 92 cents or 5.41% from $17.01 per share on Friday August 10, 2007 to $16.09 per share on Monday August 13, 2007. Its stock price declined an additional $1.09 per share the next day and another $1.19 per share on August 15th, representing a three-day decline of $3.10 or 18.22% in response to the report.

57.    On August 16, 2007, E*TRADE's stock price retreated significantly after Egan-Jones Ratings Company downgraded the Company's debt. The price declined by as much as 24%, although the share price recovered somewhat by the end of the day. Egan-Jones said in a research note that the $46.1 billion of mortgages and loan receivables "probably needs to be marked down" and that a 10% write-down "would wipe out all of E*TRADE's equity." The company's stock price closed that day at $13.55 per share (then its low for the year), 40% lower than a month earlier (July 25th) when it first announced that its earnings were being negatively affected by bad loans.

## E*TRADE Begins To Disclose The True Extent of Its Subprime Exposure

58.    On September 17, 2007, after the close of the market, E*TRADE announced that it was exiting the wholesale mortgage business[2] and revising its 2007 earnings guidance to account for higher provision for loan losses, potential securities impairments, reduced balance sheet growth and restructuring charges. The Company announced that for the full year 2007, it expected earnings per share of between $1.05

---

[2]    The wholesale mortgage business involves making loans through a network of independent mortgage brokers.

and $1.15 per share, substantially lower than its previous range of between $1.53 and $1.67 per share.

59.    E*TRADE announced that it was setting aside $245 million in the second half of the year to cover loan losses. Matt Snowling, an analyst at Friedman, Billings, Ramsey & Co., wrote in a research report that the announcement was "clearly a disappointment and is likely to cloud the name until investors gain confidence that more charges are not on the way." Bank of America analyst Michael Hecht reported that the Company's outlook "remains murky despite what the company seems to think is a 'clearing of the decks.'"

60.    In reaction to this news, on September 18, 2007, E*TRADE's stock price declined 21 cents to $14 per share, leaving the shares down by almost 50% since reaching its one-year high on June 6, 2007. Intraday, the stock fell to as low as $13.24 per share before paring losses after a surprise 50 basis point interest cut by the Federal Reserve triggered an over 330 point increase in the Dow Jones Industrial Average (its largest increase in over four years) and the biggest rally in brokerage stocks in more than year. Tellingly, E*TRADE was the only one of 92 financial companies in the Standard & Poor's 500 Index that declined for the day.

**E\*TRADE Shocks Investors With Further Subprime Woes**

61.    Then, on November 9, 2007, the Company disclosed that:

continued declines in the fair value of its $3.0 billion asset-backed securities portfolio, predominantly within ABS CDO and second-lien securities. The total exposure to ABS CDO and second-lien securities at September 30, 2007 was approximately $450 million in amortized cost, including approximately $50 million of "AAA" rated asset-backed CDOs that were downgraded to below investment grade. The Company stated that it expected the declines in fair value to result in further securities

22

write downs in the fourth quarter. The Company expects to remain well capitalized based on regulatory standards.

Management believes the additional deterioration observed since September 30 will likely result in write downs that exceed the previous expectations included in the Company's 2007 earnings outlook updated on October 17, and investors should no longer expect these earnings levels to be achieved. Actual securities-related losses will depend on future market developments, including the potential for future downgrades by rating agencies, which are extremely difficult to predict in this environment. Accordingly, management believes it is no longer beneficial to provide earnings expectations for the remainder of the year.

62.     In addition to withdrawing its earnings guidance, the Company announced that the SEC had begun an investigation of E*TRADE, and announced for the first time that 90% of its home equity loans were purchased from third parties as opposed to being originated by the Company. The Company also announced the departure of Dennis E. Webb, the former division President of E*TRADE Capital Markets.[3]

63.     On Sunday, November 11, 2007, Bhatia, the Citibank analyst, downgraded E*TRADE to a sell in a research report entitled: "Bankruptcy Risk Cannot Be Ruled Out—Downgrading To A Sell." In the report, Bhatia noted the existence of the SEC investigation, further noted that E*TRADE could fall below "well capitalized" levels and stated: "We estimate that trying to liquidate E*Trade's loan & ABS portfolio would result in over $5b of losses (more than wiping out tangible equity)." The report further states that:

> We expect further deterioration in the $3.1[billion] ABS portfolio, especially related to CDO and subprime exposure (we estimate over $500[million] of losses). In addition to pressure on the lower rated parts of the portfolio, portions previously rated AAA have fallen below investment grade. With continued actions from rating agencies, in our view, this trend will likely continue.

---

[3]     During the Class Period, Webb sold 229,000 E*TRADE shares for gross profits of over $5.7 million.

64.    On Monday, November 12, 2007, E*TRADE's stock plummeted $5.04 from a prior trading day close of $8.59 to a November 12th close of just $3.55, a staggering 58.67% one-day loss.

## INAPPLICABILITY OF SAFE HARBOR

65.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of E*TRADE were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that members of the investing public were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.

66.    Defendants participated in and knew of the fraudulent scheme alleged herein, by virtue of their receipt of information reflecting the true facts regarding E*TRADE; their control over, and/or receipt of E*TRADE's allegedly materially misleading misstatements; and/or their association with E*TRADE, all of which made them privy to confidential proprietary information concerning E*TRADE.

67.    With respect to non-forward-looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

68.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions

existing at the time the statements were made. No statutory safe harbor applies to any of Defendants materially false or misleading statements.

69.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pleaded herein, Defendants are liable for the false forward-looking statement pleaded because, at the time each forward-looking statement was made, the defendant making the statement knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of E*TRADE who knew that the forward-looking statement was false or misleading. None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made. Nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## ADDITIONAL SCIENTER ALLEGATIONS

70.    The Individual Defendants were active, culpable, and primary participants in the fraud by virtue of: (1) their knowledge of (a) the increasing risks to which E*TRADE was exposed due to defaults in its subprime mortgage portfolio; and (b) the inflation in the ratings and value accorded debt instruments linked to E*TRADE's subprime mortgages and mortgage-backed securities; (2) their supervision over E*TRADE's employees and actual direction of policies that encouraged the fraud detailed herein; and (3) their association with the Company which made them privy to confidential information concerning the Company.

71.    The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public. The Individual Defendants also knew or recklessly disregarded that the failure to disclose the Company's exposure to subprime mortgages and the overvaluing of mortgage backed debt securities, would cause E*TRADE's financial statements to be materially false and misleading, would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated. The Individual Defendants acted knowingly or in such a reckless manner as to constitute fraud and deceit upon Plaintiff and the Class.

72.    The Individual Defendants directed, knew about or recklessly disregarded the fraudulent practices implemented under their watch. As officers of the Company, the Individual Defendants each knew, through direct knowledge or knowledge learned through the supervisory nature of their positions or recklessly disregarded and failed to disclose, material adverse information; were involved in the decisions concerning subprime mortgages and related securities at the Company; and, made false and misleading statements of material fact.

73.    The Individual Defendants had substantial motivation to participate in the fraudulent practices alleged herein. The fraudulent practices alleged herein enabled the Individual Defendants to sell more than 300,000 shares of E*TRADE stock that had been held by them during the Class Period for which they netted over $7.5 million in proceeds. The shares sold by the insider-Individual Defendants during the Class Period are set forth in the chart below:

| Date | Shares | Price | Amount |
|------|--------|-------|--------|
| **Robert J. Simmons** | | | |
| 05/11/06 | 47,243 | $26.25 | $1,240,128 |
| 05/12/06 | 47,243 | $25.33 | $1,196,665 |
| 05/15/06 | 47,244 | $24.86 | $1,174,485 |
| 07/24/06 | 25,000 | $22.35 | $558,750 |
| 10/23/06 | 25,000 | $22.14 | $553,500 |
| 01/29/07 | 25,000 | $23.88 | $597,000 |
| 04/23/07 | 25,000 | $21.76 | $544,000 |
| **Total** | **241,730** | **$24.26** | **$5,864,528** |
| | | | |
| **Mitchell H. Caplan** | | | |
| 02/26/07 | 72,211 | $24.08 | $1,738,840 |

## LOSS CAUSATION

74.     Throughout the Class Period, the price of E*TRADE's securities was massively inflated as the result of Defendants' false and misleading statements and omissions concerning E*TRADE's financial health. But for Defendants' misrepresentations and omissions, which had the effect of overstating shareholders' equity, assets and investment income, while understating liabilities, Plaintiff would not have purchased E*TRADE's securities at the artificially inflated prices at which they were offered.

75.     As a direct result of Defendants' scheme, misrepresentations and omissions of material facts the price of E*TRADE's common stock was artificially inflated throughout the Class Period. When the truth of E*TRADE's financial condition was revealed beginning in July 2007, E*TRADE's stock price collapsed dramatically.

76.     In July 2007, prior to any disclosures by the Company about E*TRADE's subprime exposure, the Company shares traded at about $22. On July 25, 2007, the Company's provision for loan losses ("charge-offs") rose to $30 million in the quarter, double the level of the year prior. In reaction to this news, E*TRADE's stock price dropped $1.41 per share from $20.46 per share on July 25, 2007, to $19.05 per share on

July 26, 2007 — a 6.89% one-day drop. Over the next two weeks, E*TRADE's stock price continued to trade lower on concerns over the Company's credit exposure with E*TRADE stock price closing near $17 per share on August 10, 2007.

77.   On September 17, 2007, after the close of the market, E*TRADE announced that it was exiting the wholesale mortgage business and revising its 2007 earnings guidance to account for higher provision for loan losses, potential securities impairments, reduced balance sheet growth and restructuring charges. The Company announced that for the full year 2007, it then expected earnings per share of between $1.05 and $1.15 per share, substantially lower than its previous range of between $1.53 and $1.67 per share. E*TRADE further announced that it was setting aside $245 million in the second half of the year to cover loan losses.

78.   In reaction to this news, on September 18, 2007, E*TRADE's stock price declined 21 cents to $14 per share, leaving the shares down by almost 50% since reaching its one-year high on June 6, 2007. Intraday, the stock fell to as low as $13.24 per share before paring losses after a surprise 50 basis point interest cut by the Federal Reserve trigged an over 330 point increase in the Dow Jones Industrial Average (its largest increase in over four years) and the biggest rally in brokerage stocks in more than a year. E*TRADE was the only one of 92 financial companies in the Standard & Poor's 500 Index that declined for the day.

79.   Late on Friday, November 9, 2007, E*TRADE announced that further deterioration in its mortgage-backed securities portfolio would lead to larger than expected write-downs in the fourth-quarter of 2007, withdrew its earnings guidance and reported that the SEC had commenced an investigation. The stock plummeted from a

close of $8.59 on November 9 to $3.55 on Monday, November 12, 2007, a one day drop of 58.67%. Since July 2007, therefore, the stock has dropped from over $20 to $3.55, representing a loss of over $8 billion in market capitalization.

## CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased E*TRADE securities during the Class Period and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of Defendants; (5) any entity in which any of Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

81.    The members of the Class are so numerous that joinder of all members is impracticable. As of November 5, 2007, there were approximately 423,750,000 shares of E*TRADE common stock outstanding. While Plaintiff does not know the exact number of Class members, Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased E*TRADE securities during the Class Period.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

83.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether the SEC filings, and other public statements published and disseminated to the investing public and purchasers of the common stock during the Class Period omitted and/or misrepresented material facts about the risks of E*TRADE's mortgage backed securities;

(c)     Whether Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability and present and future prospects of the Company;

(d)     With respect to Plaintiff's claims under the Exchange Act, whether Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts about the financial condition, profitability and present and future prospects of the Company;

(e)     Whether the market price of E*TRADE common stock during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(f)     Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

84.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class and

has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

85.    A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress Defendants' wrongful conduct. Furthermore, Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE- MARKET DOCTRINE

86.    The market for E*TRADE's securities was open and efficient at all relevant times for the following reasons (among others):

(a)    The Company's securities met the requirements for trading on NASDAQ;

(b)    As a regulated issuer, E*TRADE filed periodic public reports with the SEC;

(c)    E*TRADE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    The market reacted to public information disseminated by E*TRADE;

(e)      E*TRADE was followed by numerous material securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public market place;

(f)      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of E*TRADE securities; and

(g)      Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired E*TRADE securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of E*TRADE securities was inflated by Defendants' misrepresentations and omissions.

87.    As a result of the foregoing, the market for E*TRADE securities promptly digested current information regarding E*TRADE from all publicly available sources and reflected such information in E*TRADE's securities prices.  Under these circumstances, all purchasers and acquirers of E*TRADE's securities during the Class Period suffered similar injury through their purchase or acquisition of E*TRADE's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER
### (AGAINST ALL DEFENDANTS)

88.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

90.    During the Class Period, Defendants, who owed a fiduciary duty to Plaintiff and the Class, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) artificially inflate and maintain the market price of E*TRADE's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

91.    The Defendants:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use means or instrumentalities of interstate commerce; and (c) engaged in acts, practices, and course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for E*TRADE securities in violation of Section 10(b) and Rule 10b-5.

92.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §29.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so

that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information. Defendant's material misrepresentations and omissions as set forth herein violated that duty.

93.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

94.    As a result of Defendants' fraudulent activity, the market price of E*TRADE's securities was artificially inflated during the Class Period.

95.    In ignorance of the truth concerning E*TRADE's true financial condition and exposure to subprime mortgage-related liabilities, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of E*TRADE containing the misleading information, purchased or otherwise acquired E*TRADE securities at artificially inflated prices during the Class Period.

96.    E*TRADE knew that its potential exposure to subprime mortgage losses was greater than that disclosed in its public statements and that it carried significantly more risk of loss due to its exposure to subprime mortgages. Accordingly, the decline in the Company's market capitalization that occurred between July 24, 2007 and November 12, 2007 was directly attributable to Defendant's fraudulent conduct as alleged herein.

97.    Plaintiff's (and the Class's) losses were proximately caused by Defendants' active and primary participation in E*TRADE's fraud the investing public. Plaintiff (and members of the Class) purchased E*TRADE securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of

E*TRADE securities through their misconduct as described herein. Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses. Plaintiff's (and the Class's) losses were a direct and foreseeable consequence of Defendants' failure to disclose and the concealment of, *inter alia*, the true state of the business operations and financial condition of E*TRADE.

98.     Throughout the Class Period, Defendants were aware of material non-public information concerning E*TRADE's fraudulent conduct (including false and misleading statements identified herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding E*TRADE's exposure to liabilities due to subprime mortgages, and Plaintiff's (and the Class's) losses were the foreseeable consequence of Defendants' concealment of this information.

99.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of E*TRADE securities during the class period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

100.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

101.    As alleged herein, the Individual Defendants acted as controlling persons of E*TRADE within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly of indirectly, the decision-making of the Company, including the content

and dissemination of the various statements which Plaintiff contends is false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    As set forth above, the Individual Defendants and E*TRADE committed a primary violation of Section 10(b) and Rule 10b-5 by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of E*TRADE, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their purchases or acquisition of E*TRADE securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

(B)    Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiff and the Class for all losses and damages suffered as a

result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

(C)    Awarding Plaintiff his reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

(D)    Awarding the Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: November 21, 2007

GARDY & NOTIS, LLP

By: _____

James S. Notis (JN 4189)
Dustin Mansoor (DM 4039)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiff*

## CERTIFICATION

I, Joshua Ferenc, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint, and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's purchase and sale transaction(s) in the E*Trade Financial Corporation (NASDAQ: ETFC) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| SEE ATTACHED | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of _November_, 2007

____Joshua Ferenc____            ___[signature]___
Print Name                                Signature

| Search Criteria | . | | Start Date:12/14/2006 | End Date :10/18/2( |
|---|---|---|---|---|
| Total Long-Term ( | Total Short-Term Gain/(Loss): | | Total Commissions/Fees: 2052.66 | |
| Symbol | Qty | | Opening Date | Opening Price |
| ETFC | | 335 | 09/05/2007 | 15.62 |
| ETFC | | 165 | 09/05/2007 | 15.62 |
| ETFC | | 300 | 09/05/2007 | 15.62 |
| ETFC | | 335 | 09/10/2007 | 14.15 |
| ETFC | | 665 | 09/10/2007 | 14.15 |
| ETFC | | 2200 | 09/12/2007 | 13.92 |
| ETFC | | 800 | 09/12/2007 | 13.92 |
| ETFC | | 2000 | 09/12/2007 | 13.93 |
| ETFC | | 1000 | 09/12/2007 | 13.93 |
| ETFC | | 900 | 09/12/2007 | 13.98 |
| ETFC | | 1200 | 09/12/2007 | 13.98 |
| ETFC | | 400 | 09/12/2007 | 13.98 |
| ETFC | | 800 | 09/12/2007 | 14.01 |
| ETFC | | 50 | 09/12/2007 | 14.01 |
| ETFC | | 3150 | 09/12/2007 | 14.01 |
| ETFC | | 323 | 09/12/2007 | 14.01 |
| ETFC | | 12 | 09/12/2007 | 14.01 |
| ETFC | | 1665 | 09/12/2007 | 14.01 |
| ETFC | | 35 | 09/12/2007 | 14.07 |
| ETFC | | 1000 | 09/12/2007 | 14.07 |
| ETFC | | 300 | 09/12/2007 | 14.07 |
| ETFC | | 665 | 09/12/2007 | 14.07 |
| ETFC | | 335 | 09/12/2007 | 14.11 |
| ETFC | | 1665 | 09/12/2007 | 14.11 |
| ETFC | | 13000 | 09/17/2007 | 14.26 |
| ETFC | | 1700 | 09/17/2007 | 14.2799 |
| ETFC | | 1000 | 09/17/2007 | 14.2799 |
| ETFC | | 279 | 09/17/2007 | 14.2799 |
| ETFC | | 668 | 09/17/2007 | 14.2799 |
| ETFC | | 100 | 09/17/2007 | 14.2799 |
| ETFC | | 100 | 09/17/2007 | 14.2799 |
| ETFC | | 100 | 09/17/2007 | 14.2799 |
| ETFC | | 300 | 09/17/2007 | 14.2799 |
| ETFC | | 2700 | 09/17/2007 | 14.2799 |
| ETFC | | 53 | 09/17/2007 | 14.2799 |
| ETFC | | 2000 | 09/17/2007 | 14.2799 |
| ETFC | | 300 | 09/17/2007 | 14.26 |
| ETFC | | 500 | 09/17/2007 | 14.26 |
| ETFC | | 100 | 09/17/2007 | 14.26 |
| ETFC | | 100 | 09/17/2007 | 14.26 |
| ETFC | | 400 | 09/17/2007 | 14.26 |
| ETFC | | 100 | 09/17/2007 | 14.26 |
| ETFC | | 300 | 09/17/2007 | 14.26 |
| ETFC | | 150 | 09/17/2007 | 14.26 |

| | | | |
|---|---|---|---|
| ETFC | 400 | 09/17/2007 | 14.26 |
| ETFC | 700 | 09/17/2007 | 14.26 |
| ETFC | 100 | 09/17/2007 | 14.26 |
| ETFC | 16850 | 09/17/2007 | 14.26 |
| ETFC | 7636 | 09/17/2007 | 14.2799 |
| ETFC | 1000 | 09/17/2007 | 14.2799 |
| ETFC | 300 | 09/17/2007 | 14.2799 |
| ETFC | 100 | 09/17/2007 | 14.2799 |
| ETFC | 250 | 09/17/2007 | 14.2799 |
| ETFC | 700 | 09/17/2007 | 14.2799 |
| ETFC | 100 | 09/17/2007 | 14.2799 |
| ETFC | 550 | 09/17/2007 | 14.2799 |
| ETFC | 364 | 09/17/2007 | 14.2799 |
| ETFC | 136 | 09/17/2007 | 14.28 |
| ETFC | 264 | 09/17/2007 | 14.28 |
| ETFC | 1000 | 09/17/2007 | 14.28 |
| ETFC | 14700 | 09/17/2007 | 14.28 |
| ETFC | 76 | 09/17/2007 | 14.28 |
| ETFC | 3824 | 09/17/2007 | 14.28 |
| ETFC | 10000 | 09/17/2007 | 14.31 |
| ETFC | 400 | 09/17/2007 | 14.34 |
| ETFC | 100 | 09/17/2007 | 14.34 |
| ETFC | 100 | 09/17/2007 | 14.34 |
| ETFC | 500 | 09/17/2007 | 14.34 |
| ETFC | 18900 | 09/17/2007 | 14.34 |
| ETFC | 10000 | 09/17/2007 | 14.35 |
| ETFC | 600 | 09/18/2007 | 13.48957 |
| ETFC | 100 | 09/18/2007 | 13.48957 |
| ETFC | 3900 | 09/18/2007 | 13.48957 |
| ETFC | 100 | 09/18/2007 | 13.48957 |
| ETFC | 1000 | 09/18/2007 | 13.48957 |
| ETFC | 100 | 09/18/2007 | 13.48957 |
| ETFC | 1900 | 09/18/2007 | 13.48957 |
| ETFC | 700 | 09/18/2007 | 13.48957 |
| ETFC | 900 | 09/18/2007 | 13.48957 |
| ETFC | 100 | 09/18/2007 | 13.48957 |
| ETFC | 1800 | 09/18/2007 | 13.48 |
| ETFC | 1600 | 09/18/2007 | 13.48 |
| ETFC | 100 | 09/18/2007 | 13.48 |
| ETFC | 1300 | 09/18/2007 | 13.48 |
| ETFC | 400 | 09/18/2007 | 13.48 |
| ETFC | 1100 | 09/18/2007 | 13.48 |
| ETFC | 4300 | 09/18/2007 | 13.48 |
| ETFC | 4962 | 09/18/2007 | 13.6 |
| ETFC | 1040 | 09/18/2007 | 13.6 |
| ETFC | 2555 | 09/18/2007 | 13.6 |
| ETFC | 944 | 09/18/2007 | 13.60017 |

| ETFC | | 5000 | 09/18/2007 | 13.60017 |
|------|--|------|------------|----------|
| ETFC | | 3000 | 09/18/2007 | 13.60017 |
| ETFC | | 1600 | 09/18/2007 | 13.60017 |
| ETFC | | 500 | 09/18/2007 | 13.60017 |
| ETFC | | 399 | 09/18/2007 | 13.60017 |
| ETFC | | 101 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 599 | 09/18/2007 | 13.5 |
| ETFC | | 11328 | 09/18/2007 | 13.5 |
| ETFC | | 2000 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 2000 | 09/18/2007 | 13.5 |
| ETFC | | 500 | 09/18/2007 | 13.5 |
| ETFC | | 472 | 09/18/2007 | 13.5 |
| ETFC | | 5000 | 09/19/2007 | 14.43 |
| ETFC | | 4100 | 09/19/2007 | 14.43 |
| ETFC | | 1 | 09/19/2007 | 14.43 |
| ETFC | | 400 | 09/19/2007 | 14.43 |
| ETFC | | 5799 | 09/19/2007 | 14.43 |
| ETFC | | 9700 | 09/19/2007 | 14.4401 |
| ETFC | | 6500 | 09/24/2007 | 12.68 |
| ETFC | | 200 | 09/24/2007 | 12.68 |
| ETFC | | 3300 | 09/24/2007 | 12.68 |
| ETFC | | 4598 | 09/24/2007 | 12.76 |
| ETFC | | 500 | 09/24/2007 | 12.76 |
| ETFC | | 4698 | 09/24/2007 | 12.76 |
| ETFC | | 5204 | 09/24/2007 | 12.76 |
| ETFC | | 1196 | 09/24/2007 | 13.09 |
| ETFC | | 1000 | 09/24/2007 | 13.09 |
| ETFC | | 1652 | 09/24/2007 | 13.09 |
| ETFC | | 1248 | 09/24/2007 | 13.09 |
| ETFC | | 600 | 09/24/2007 | 13.09 |
| ETFC | | 300 | 09/24/2007 | 13.09 |
| ETFC | | 4 | 09/24/2007 | 13.09 |
| ETFC | | 650 | 09/24/2007 | 13.09 |
| ETFC | | 30 | 09/24/2007 | 13.09 |
| ETFC | | 1000 | 09/24/2007 | 13.09 |
| ETFC | | 39 | 09/24/2007 | 13.09 |
| ETFC | | 129 | 09/24/2007 | 13.09 |
| ETFC | | 871 | 09/24/2007 | 13.09 |
| ETFC | | 500 | 09/24/2007 | 13.09 |
| ETFC | | 200 | 09/24/2007 | 13.09 |
| ETFC | | 800 | 09/24/2007 | 13.09 |

| | | | |
|---|---|---|---|
| ETFC | 400 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 500 | 09/24/2007 | 13.09 |
| ETFC | 1000 | 09/24/2007 | 13.09 |
| ETFC | 400 | 09/24/2007 | 13.09 |
| ETFC | 500 | 09/24/2007 | 13.09 |
| ETFC | 1000 | 09/24/2007 | 13.09 |
| ETFC | 69 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 200 | 09/24/2007 | 13.09 |
| ETFC | 160 | 09/24/2007 | 13.09 |
| ETFC | 50 | 09/24/2007 | 13.09 |
| ETFC | 190 | 09/24/2007 | 13.09 |
| ETFC | 126 | 09/24/2007 | 13.09 |
| ETFC | 40 | 09/24/2007 | 13.09 |
| ETFC | 500 | 09/24/2007 | 13.09 |
| ETFC | 134 | 09/24/2007 | 13.09 |
| ETFC | 66 | 09/24/2007 | 13.09 |
| ETFC | 200 | 09/24/2007 | 13.09 |
| ETFC | 300 | 09/24/2007 | 13.09 |
| ETFC | 34 | 09/24/2007 | 13.09 |
| ETFC | 800 | 09/24/2007 | 13.09 |
| ETFC | 416 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 276 | 09/24/2007 | 13.09 |
| ETFC | 600 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 500 | 09/24/2007 | 13.09 |
| ETFC | 200 | 09/24/2007 | 13.09 |
| ETFC | 400 | 09/24/2007 | 13.09 |
| ETFC | 100 | 09/24/2007 | 13.09 |
| ETFC | 500 | 09/24/2007 | 13.09 |
| ETFC | 324 | 09/24/2007 | 13.09 |
| ETFC | 76 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 150 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 400 | 09/24/2007 | 13.1 |
| ETFC | 166 | 09/24/2007 | 13.1 |
| ETFC | 34 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |

| | | | |
|------|------|------------|------|
| ETFC | 466 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 68 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 66 | 09/24/2007 | 13.1 |
| ETFC | 134 | 09/24/2007 | 13.1 |
| ETFC | 866 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 400 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 1100 | 09/24/2007 | 13.1 |
| ETFC | 330 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 631 | 09/24/2007 | 13.1 |
| ETFC | 104 | 09/24/2007 | 13.1 |
| ETFC | 396 | 09/24/2007 | 13.1 |
| ETFC | 304 | 09/24/2007 | 13.1 |
| ETFC | 96 | 09/24/2007 | 13.1 |
| ETFC | 104 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 400 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 1076 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 300 | 09/24/2007 | 13.1 |
| ETFC | 50 | 09/24/2007 | 13.1 |
| ETFC | 75 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 300 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 392 | 09/24/2007 | 13.1 |
| ETFC | 3203 | 09/24/2007 | 13.1 |
| ETFC | 9 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 107 | 09/24/2007 | 13.1 |
| ETFC | 140 | 09/24/2007 | 13.1 |
| ETFC | 4215 | 09/24/2007 | 13.1 |
| ETFC | 342 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 111 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |

| | | | |
|---|---|---|---|
| ETFC | 1247 | 09/24/2007 | 13.1 |
| ETFC | 178 | 09/24/2007 | 13.1 |
| ETFC | 160 | 09/24/2007 | 13.1 |
| ETFC | 1040 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 1000 | 09/24/2007 | 13.1 |
| ETFC | 400 | 09/24/2007 | 13.1 |
| ETFC | 460 | 09/24/2007 | 13.1 |
| ETFC | 15 | 09/24/2007 | 13.1 |
| ETFC | 5185 | 09/24/2007 | 13.1 |
| ETFC | 1300 | 09/24/2007 | 13.1 |
| ETFC | 600 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 800 | 09/24/2007 | 13.1 |
| ETFC | 1000 | 09/24/2007 | 13.1 |
| ETFC | 100 | 09/24/2007 | 13.1 |
| ETFC | 95 | 09/24/2007 | 13.1 |
| ETFC | 5 | 09/24/2007 | 13.1 |
| ETFC | 800 | 09/24/2007 | 13.1 |
| ETFC | 1000 | 09/24/2007 | 13.1 |
| ETFC | 250 | 09/24/2007 | 13.1 |
| ETFC | 600 | 09/24/2007 | 13.1 |
| ETFC | 2650 | 09/24/2007 | 13.1 |
| ETFC | 241 | 09/24/2007 | 13.1 |
| ETFC | 259 | 09/24/2007 | 13.1 |
| ETFC | 1300 | 09/24/2007 | 13.1 |
| ETFC | 200 | 09/24/2007 | 13.1 |
| ETFC | 600 | 09/24/2007 | 13.11 |
| ETFC | 1500 | 09/24/2007 | 13.11 |
| ETFC | 1200 | 09/24/2007 | 13.11 |
| ETFC | 200 | 09/24/2007 | 13.11 |
| ETFC | 6500 | 09/24/2007 | 13.11 |
| ETFC | 700 | 09/24/2007 | 13.12 |
| ETFC | 2320 | 09/24/2007 | 13.12 |
| ETFC | 200 | 09/24/2007 | 13.12 |
| ETFC | 280 | 09/24/2007 | 13.12 |
| ETFC | 100 | 09/24/2007 | 13.12 |
| ETFC | 200 | 09/24/2007 | 13.12 |
| ETFC | 100 | 09/24/2007 | 13.12 |
| ETFC | 200 | 09/24/2007 | 13.12 |
| ETFC | 100 | 09/24/2007 | 13.12 |
| ETFC | 200 | 09/24/2007 | 13.12 |
| ETFC | 100 | 09/24/2007 | 13.12 |
| ETFC | 200 | 09/24/2007 | 13.12 |
| ETFC | 1300 | 09/24/2007 | 13.12 |
| ETFC | 100 | 09/24/2007 | 13.12 |
| ETFC | 500 | 09/24/2007 | 13.12 |

| ETFC | | 100 | 09/24/2007 | 13.12 |
|------|--|-----|------------|-------|
| ETFC | | 200 | 09/24/2007 | 13.12 |
| ETFC | | 300 | 09/24/2007 | 13.12 |
| ETFC | | 20 | 09/24/2007 | 13.12 |
| ETFC | | 26 | 09/24/2007 | 13.12 |
| ETFC | | 54 | 09/24/2007 | 13.12 |
| ETFC | | 200 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 600 | 09/24/2007 | 13.12 |
| ETFC | | 700 | 09/24/2007 | 13.12 |
| ETFC | | 600 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.12 |
| ETFC | | 100 | 09/24/2007 | 13.13 |
| ETFC | | 23 | 09/24/2007 | 13.13 |
| ETFC | | 100 | 09/24/2007 | 13.13 |
| ETFC | | 100 | 09/24/2007 | 13.13 |
| ETFC | | 1500 | 09/24/2007 | 13.13 |
| ETFC | | 1577 | 09/24/2007 | 13.13 |
| ETFC | | 100 | 09/24/2007 | 13.13 |
| ETFC | | 3200 | 09/24/2007 | 13.13 |
| ETFC | | 1800 | 09/24/2007 | 13.13 |

| Symbol : ETFC | | | | | |
| | | | | | |
| Opening Net Am | Order | Closing Date | Closing Price | Closing Net Amount | Gain (Loss) |
| 5236.88 | S | 09/17/2007 | 14.43 | 4833.98 | -402.91 |
| 2579.36 | S | 09/17/2007 | 14.43 | 2380.91 | -198.45 |
| 4689.75 | S | 09/17/2007 | 13 | 3898.44 | -791.31 |
| 4742.93 | S | 09/17/2007 | 14.43 | 4833.98 | 91.05 |
| 9415.06 | S | 09/17/2007 | 14.43 | 9595.8 | 180.74 |
| 30629.86 | S | 09/17/2007 | 14.43 | 31737.53 | 1107.67 |
| 11138.13 | S | 09/17/2007 | 14.43 | 11543.82 | 405.69 |
| 27865.33 | S | 09/17/2007 | 14.43 | 28859.56 | 994.23 |
| 13932.66 | S | 09/17/2007 | 14.43 | 14429.78 | 497.12 |
| 12584.88 | S | 09/17/2007 | 14.43 | 12986.8 | 401.93 |
| 16779.84 | S | 09/17/2007 | 14.43 | 17315.74 | 535.9 |
| 5593.28 | S | 09/17/2007 | 14.43 | 5771.91 | 178.63 |
| 11209.6 | S | 09/17/2007 | 14.43 | 11543.82 | 334.23 |
| 700.6 | S | 09/17/2007 | 14.43 | 721.49 | 20.89 |
| 44137.79 | S | 09/17/2007 | 14.43 | 45453.81 | 1316.01 |
| 4526.52 | S | 09/17/2007 | 14.43 | 4660.82 | 134.3 |
| 168.17 | S | 09/17/2007 | 14.43 | 173.16 | 4.99 |
| 23333.3 | S | 09/17/2007 | 14.43 | 24025.58 | 692.28 |
| 492.59 | S | 09/17/2007 | 14.43 | 505.04 | 12.45 |
| 14074 | S | 09/17/2007 | 14.43 | 14429.78 | 355.79 |
| 4222.2 | S | 09/17/2007 | 14.43 | 4328.93 | 106.74 |
| 9359.21 | S | 09/17/2007 | 14.43 | 9595.8 | 236.6 |
| 4728.19 | S | 09/17/2007 | 14.43 | 4833.98 | 105.79 |
| 23499.8 | S | 09/17/2007 | 14.43 | 24025.58 | 525.78 |
| 185388 | S | 09/17/2007 | 14.29 | 185760.11 | 372.11 |
| 24276.51 | S | 09/17/2007 | 14.29 | 24291.71 | 15.2 |
| 14280.3 | S | 09/17/2007 | 14.29 | 14289.78 | 9.48 |
| 3984.2 | S | 09/17/2007 | 14.29 | 3986.85 | 2.65 |
| 9539.24 | S | 09/17/2007 | 14.29 | 9545.57 | 6.33 |
| 1428.03 | S | 09/17/2007 | 14.29 | 1428.98 | 0.95 |
| 1428.03 | S | 09/17/2007 | 14.29 | 1428.98 | 0.95 |
| 1428.03 | S | 09/17/2007 | 14.29 | 1428.98 | 0.95 |
| 4284.09 | S | 09/17/2007 | 14.29 | 4286.93 | 2.84 |
| 38556.81 | S | 09/17/2007 | 14.29 | 38582.41 | 25.6 |
| 756.86 | S | 09/17/2007 | 14.29 | 757.36 | 0.5 |
| 28560.6 | S | 09/17/2007 | 14.32 | 28631.57 | 70.97 |
| 4278.12 | S | 09/17/2007 | 14.23 | 4260.94 | -17.18 |
| 7130.2 | S | 09/17/2007 | 13.15 | 6564.41 | -565.79 |
| 1426.04 | S | 09/17/2007 | 13.15 | 1314.48 | -111.56 |
| 1426.04 | S | 09/17/2007 | 13.15 | 1314.48 | -111.56 |
| 5704.16 | S | 09/17/2007 | 13.15 | 5257.92 | -446.24 |
| 1426.04 | S | 09/17/2007 | 12.96 | 1287.49 | -138.55 |
| 4278.12 | S | 09/17/2007 | 12.95 | 3883.44 | -394.68 |
| 2139.06 | S | 09/17/2007 | 12.95 | 1941.72 | -197.34 |

| | | | | | |
|---|---|---|---|---|---|
| 5704.16 | S | 09/17/2007 | 12.96 | 5181.92 | -522.24 |
| 9982.28 | S | 09/17/2007 | 12.95 | 9061.36 | -920.92 |
| 1426.04 | S | 09/17/2007 | 12.95 | 1294.48 | -131.56 |
| 240287.74 | S | 09/17/2007 | 12.95 | 218119.91 | -22167.83 |
| 109044.37 | S | 09/17/2007 | 12.95 | 98846.51 | -10197.86 |
| 14280.3 | S | 09/17/2007 | 12.95 | 12944.8 | -1335.5 |
| 4284.09 | S | 09/17/2007 | 12.95 | 3883.44 | -400.65 |
| 1428.03 | S | 09/17/2007 | 12.95 | 1294.48 | -133.55 |
| 3570.08 | S | 09/17/2007 | 12.95 | 3236.2 | -333.87 |
| 9996.21 | S | 09/17/2007 | 12.95 | 9061.36 | -934.85 |
| 1428.03 | S | 09/17/2007 | 12.95 | 1294.48 | -133.55 |
| 7854.16 | S | 09/17/2007 | 12.95 | 7119.64 | -734.52 |
| 5198.03 | S | 09/17/2007 | 12.95 | 4711.91 | -486.12 |
| 1942.08 | S | 09/17/2007 | 12.95 | 1760.49 | -181.59 |
| 3769.92 | S | 09/17/2007 | 12.95 | 3417.43 | -352.49 |
| 14280 | S | 09/17/2007 | 12.75 | 12736.82 | -1543.19 |
| 209916 | S | 09/17/2007 | 12.75 | 187348.63 | -22567.37 |
| 1085.28 | S | 09/17/2007 | 12.75 | 968.61 | -116.67 |
| 54614.71 | S | 09/17/2007 | 12.75 | 48736.13 | -5878.57 |
| 143107.99 | S | 09/17/2007 | 12.75 | 127448.05 | -15659.94 |
| 5736.16 | S | 09/17/2007 | 12.75 | 5097.92 | -638.24 |
| 1434.04 | S | 09/17/2007 | 13.01 | 1292.49 | -141.55 |
| 1434.04 | S | 09/17/2007 | 13 | 1299.48 | -134.56 |
| 7170.2 | S | 09/17/2007 | 13 | 6497.4 | -672.8 |
| 271033.56 | S | 09/17/2007 | 13 | 245601.76 | -25431.8 |
| 143507.99 | S | 09/17/2007 | 13 | 129948.02 | -13559.97 |
| 8093.62 | BC | 09/18/2007 | 13.33 | 8005.99 | 87.63 |
| 1348.94 | BC | 09/18/2007 | 13.33 | 1333 | 15.94 |
| 52608.52 | BC | 09/18/2007 | 13.33 | 51987 | 621.52 |
| 1348.94 | BC | 09/18/2007 | 13.33 | 1333 | 15.94 |
| 13489.36 | BC | 09/18/2007 | 13.33 | 13330 | 159.36 |
| 1348.94 | BC | 09/18/2007 | 13.33 | 1333 | 15.94 |
| 25629.79 | BC | 09/18/2007 | 13.33 | 25327 | 302.79 |
| 9442.55 | BC | 09/18/2007 | 13.33 | 9331 | 111.55 |
| 12140.43 | BC | 09/18/2007 | 13.33 | 11997 | 143.43 |
| 1348.94 | BC | 09/18/2007 | 13.33 | 1333 | 15.94 |
| 24262.27 | BC | 09/18/2007 | 13.33 | 23994 | 268.27 |
| 21566.46 | BC | 09/18/2007 | 13.33 | 21328 | 238.46 |
| 1347.9 | BC | 09/18/2007 | 13.33 | 1333 | 14.9 |
| 17522.75 | BC | 09/18/2007 | 13.33 | 17329 | 193.75 |
| 5391.62 | BC | 09/18/2007 | 13.33 | 5332 | 59.62 |
| 14826.94 | BC | 09/18/2007 | 13.33 | 14663 | 163.94 |
| 57959.87 | BC | 09/18/2007 | 13.33 | 57319 | 640.87 |
| 67482.17 | BC | 09/19/2007 | 14.2 | 70460.4 | -2978.23 |
| 14143.78 | BC | 09/19/2007 | 14.2 | 14768 | -624.22 |
| 34747.47 | BC | 09/19/2007 | 14.2 | 36281 | -1533.53 |
| 12837.71 | BC | 09/19/2007 | 14.2 | 13404.8 | -567.09 |

| | | | | | |
|---:|---|---|---:|---:|---:|
| 67996.32 | BC | 09/19/2007 | 14.2 | 71000 | -3003.68 |
| 40797.79 | BC | 09/19/2007 | 14.2 | 42600 | -1802.21 |
| 21758.82 | BC | 09/19/2007 | 14.2 | 22720 | -961.18 |
| 6799.63 | BC | 09/19/2007 | 14.16 | 7080 | -280.37 |
| 5426.11 | BC | 09/19/2007 | 14.16 | 5649.84 | -223.73 |
| 1363.48 | BC | 09/19/2007 | 14.16 | 1430.16 | -66.68 |
| 6749.9 | BC | 09/19/2007 | 14.16 | 7080 | -330.1 |
| 8086.38 | BC | 09/19/2007 | 14.16 | 8481.84 | -395.46 |
| 152920.84 | BC | 09/19/2007 | 14.16 | 160404.48 | -7483.64 |
| 26998.74 | BC | 09/19/2007 | 14.16 | 28320 | -1321.26 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 26998.74 | BC | 09/19/2007 | 14.16 | 28320 | -1321.26 |
| 6749.68 | BC | 09/19/2007 | 14.16 | 7080 | -330.32 |
| 6371.7 | BC | 09/19/2007 | 14.16 | 6683.52 | -311.82 |
| 72140.9 | BC | 09/19/2007 | 14.16 | 70804.39 | 1336.52 |
| 59162.09 | BC | 09/19/2007 | 14.16 | 58059.6 | 1102.49 |
| 14.43 | BC | 09/19/2007 | 14.16 | 14.16 | 0.27 |
| 5771.91 | BC | 09/19/2007 | 14.2 | 5687.99 | 83.92 |
| 83678.29 | BC | 09/19/2007 | 14.2 | 82345.8 | 1332.49 |
| 140058.83 | BC | 09/19/2007 | 14.2 | 137740 | 2318.83 |
| 82425.19 | S | 09/25/2007 | 12.05 | 78315.82 | -4109.38 |
| 2536.16 | S | 09/25/2007 | 12.05 | 2409.96 | -126.2 |
| 41846.64 | S | 09/25/2007 | 12.05 | 39764.39 | -2082.24 |
| 58672.93 | S | 09/25/2007 | 12.05 | 55405.05 | -3267.88 |
| 6380.27 | S | 09/25/2007 | 12.05 | 6024.91 | -355.36 |
| 59948.98 | S | 09/25/2007 | 12.05 | 56610.04 | -3338.95 |
| 66405.81 | S | 09/25/2007 | 12.05 | 62707.24 | -3698.57 |
| 15655.64 | S | 09/25/2007 | 12.05 | 14411.58 | -1244.06 |
| 13090 | S | 09/25/2007 | 12.05 | 12049.82 | -1040.18 |
| 21624.68 | S | 09/25/2007 | 12.05 | 19906.3 | -1718.38 |
| 16336.32 | S | 09/25/2007 | 12.05 | 15038.17 | -1298.15 |
| 7854 | S | 09/25/2007 | 12.05 | 7229.89 | -624.11 |
| 3927 | S | 09/25/2007 | 12.05 | 3614.94 | -312.06 |
| 52.36 | S | 09/25/2007 | 12.05 | 48.2 | -4.16 |
| 8508.5 | S | 09/25/2007 | 12 | 7791.89 | -716.61 |
| 392.7 | S | 09/25/2007 | 11.97 | 351.1 | -41.6 |
| 13090 | S | 09/25/2007 | 11.97 | 11969.82 | -1120.18 |
| 510.51 | S | 09/25/2007 | 11.97 | 466.82 | -43.69 |
| 1688.61 | S | 09/25/2007 | 11.97 | 1544.11 | -144.5 |
| 11401.39 | S | 09/25/2007 | 11.97 | 10425.71 | -975.68 |
| 6545 | S | 09/25/2007 | 11.97 | 5984.91 | -560.09 |
| 2618 | S | 09/25/2007 | 11.97 | 2393.96 | -224.04 |
| 10472 | S | 09/25/2007 | 11.97 | 9575.85 | -896.15 |

| | | | | | |
|---|---|---|---|---|---|
| 5236 | S | 09/25/2007 | 11.97 | 4787.93 | -448.07 |
| 1309 | S | 09/25/2007 | 11.97 | 1196.98 | -112.02 |
| 6545 | S | 09/25/2007 | 11.97 | 5984.91 | -560.09 |
| 13090 | S | 09/25/2007 | 11.97 | 11969.82 | -1120.18 |
| 5236 | S | 09/25/2007 | 11.97 | 4787.93 | -448.07 |
| 6545 | S | 09/25/2007 | 11.97 | 5984.91 | -560.09 |
| 13090 | S | 09/25/2007 | 11.97 | 11969.82 | -1120.18 |
| 903.21 | S | 09/25/2007 | 11.97 | 825.92 | -77.29 |
| 1309 | S | 09/25/2007 | 11.97 | 1196.98 | -112.02 |
| 2618 | S | 09/25/2007 | 11.97 | 2393.96 | -224.04 |
| 2094.4 | S | 09/25/2007 | 11.97 | 1915.17 | -179.23 |
| 654.5 | S | 09/25/2007 | 11.97 | 598.49 | -56.01 |
| 2487.1 | S | 09/25/2007 | 11.97 | 2274.27 | -212.83 |
| 1649.34 | S | 09/25/2007 | 11.97 | 1508.2 | -141.14 |
| 523.6 | S | 09/25/2007 | 11.97 | 478.79 | -44.81 |
| 6545 | S | 09/25/2007 | 11.97 | 5984.91 | -560.09 |
| 1754.06 | S | 09/25/2007 | 11.97 | 1603.96 | -150.1 |
| 863.94 | S | 09/25/2007 | 11.97 | 790.01 | -73.93 |
| 2618 | S | 09/25/2007 | 11.97 | 2393.96 | -224.04 |
| 3927 | S | 09/25/2007 | 11.97 | 3590.95 | -336.05 |
| 445.06 | S | 09/25/2007 | 11.97 | 406.97 | -38.09 |
| 10472 | S | 09/25/2007 | 11.97 | 9575.85 | -896.15 |
| 5445.44 | S | 09/25/2007 | 11.97 | 4979.44 | -466 |
| 1309 | S | 09/25/2007 | 11.97 | 1196.98 | -112.02 |
| 3613.53 | S | 09/25/2007 | 11.97 | 3303.67 | -309.86 |
| 7855.5 | S | 09/25/2007 | 11.97 | 7181.89 | -673.61 |
| 1309.25 | S | 09/25/2007 | 11.97 | 1196.98 | -112.27 |
| 1309.25 | S | 09/25/2007 | 11.97 | 1196.98 | -112.27 |
| 1309.25 | S | 09/25/2007 | 11.97 | 1196.98 | -112.27 |
| 6546.25 | S | 09/25/2007 | 11.97 | 5984.91 | -561.34 |
| 2618.5 | S | 09/25/2007 | 11.97 | 2393.96 | -224.54 |
| 5237 | S | 09/25/2007 | 11.97 | 4787.93 | -449.07 |
| 1309.25 | S | 09/25/2007 | 11.97 | 1196.98 | -112.27 |
| 6546.25 | S | 09/25/2007 | 11.97 | 5984.91 | -561.34 |
| 4241.97 | S | 09/25/2007 | 11.97 | 3878.22 | -363.75 |
| 995.6 | S | 09/25/2007 | 11.97 | 909.71 | -85.89 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1965 | S | 09/25/2007 | 11.97 | 1795.47 | -169.53 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 5240 | S | 09/25/2007 | 11.97 | 4787.93 | -452.07 |
| 2174.6 | S | 09/25/2007 | 11.97 | 1986.99 | -187.61 |
| 445.4 | S | 09/25/2007 | 11.97 | 406.97 | -38.43 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |

| | | | | | |
|---|---|---|---|---|---|
| 6104.6 | S | 09/25/2007 | 11.97 | 5577.93 | -526.67 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 890.8 | S | 09/25/2007 | 11.97 | 813.95 | -76.85 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 864.6 | S | 09/25/2007 | 11.97 | 790.01 | -74.59 |
| 1755.4 | S | 09/25/2007 | 11.97 | 1603.96 | -151.44 |
| 11344.6 | S | 09/25/2007 | 11.97 | 10365.86 | -978.74 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 5240 | S | 09/25/2007 | 11.97 | 4787.93 | -452.07 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 14410 | S | 09/25/2007 | 11.97 | 13166.8 | -1243.2 |
| 4323 | S | 09/25/2007 | 11.97 | 3950.04 | -372.96 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 8266.1 | S | 09/25/2007 | 11.97 | 7552.95 | -713.15 |
| 1362.4 | S | 09/25/2007 | 11.97 | 1244.86 | -117.54 |
| 5187.6 | S | 09/25/2007 | 11.97 | 4740.05 | -447.55 |
| 3982.4 | S | 09/25/2007 | 11.97 | 3638.82 | -343.58 |
| 1257.6 | S | 09/25/2007 | 11.97 | 1149.1 | -108.5 |
| 1362.4 | S | 09/25/2007 | 11.97 | 1244.86 | -117.54 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 5240 | S | 09/25/2007 | 11.97 | 4787.93 | -452.07 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 14095.6 | S | 09/25/2007 | 11.97 | 12879.52 | -1216.08 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 3930 | S | 09/25/2007 | 11.97 | 3590.95 | -339.05 |
| 655 | S | 09/25/2007 | 11.97 | 598.49 | -56.51 |
| 982.5 | S | 09/25/2007 | 11.97 | 897.74 | -84.76 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 3930 | S | 09/25/2007 | 11.97 | 3590.95 | -339.05 |
| 1310 | S | 09/25/2007 | 11.97 | 1196.98 | -113.02 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 2620 | S | 09/25/2007 | 11.97 | 2393.96 | -226.04 |
| 5135.2 | S | 09/25/2007 | 11.97 | 4692.17 | -443.03 |
| 41962.45 | S | 09/25/2007 | 11.97 | 38339.32 | -3623.13 |
| 117.91 | S | 09/25/2007 | 11.97 | 107.73 | -10.18 |
| 1310.1 | S | 09/25/2007 | 11.97 | 1196.98 | -113.12 |
| 1401.81 | S | 10/01/2007 | 13.3 | 1423.08 | 21.27 |
| 1834.14 | S | 10/01/2007 | 13.3 | 1861.97 | 27.83 |
| 55220.65 | S | 10/01/2007 | 13.3 | 56050.66 | 830.01 |
| 4480.54 | S | 10/01/2007 | 13.3 | 4548.53 | 67.99 |
| 2620 | S | 10/01/2007 | 13.3 | 2659.96 | 39.96 |
| 1454.1 | S | 10/01/2007 | 13.3 | 1476.28 | 22.18 |
| 2620 | S | 10/01/2007 | 13.3 | 2659.96 | 39.96 |

| | | | | | |
|---|---|---|---|---|---|
| 16335.7 | S | 10/01/2007 | 13.3 | 16584.85 | 249.15 |
| 2331.8 | S | 10/01/2007 | 13.3 | 2367.36 | 35.56 |
| 2096 | S | 10/01/2007 | 13.3 | 2127.97 | 31.97 |
| 13624 | S | 10/01/2007 | 13.3 | 13831.79 | 207.79 |
| 2620 | S | 10/01/2007 | 13.3 | 2659.96 | 39.96 |
| 13100 | S | 10/01/2007 | 13.3 | 13299.8 | 199.8 |
| 5240 | S | 10/01/2007 | 13.3 | 5319.92 | 79.92 |
| 6026 | S | 10/01/2007 | 13.3 | 6117.91 | 91.91 |
| 196.5 | S | 10/01/2007 | 13.31 | 199.63 | 3.13 |
| 67931.49 | S | 10/01/2007 | 13.31 | 69005.46 | 1073.97 |
| 17030 | S | 10/01/2007 | 13.31 | 17301.27 | 271.27 |
| 7860 | S | 10/01/2007 | 13.31 | 7985.2 | 125.2 |
| 1310 | S | 10/01/2007 | 13.31 | 1330.98 | 20.98 |
| 10480 | S | 10/01/2007 | 13.31 | 10647.84 | 167.84 |
| 13100 | S | 10/01/2007 | 13.31 | 13309.8 | 209.8 |
| 1310 | S | 10/01/2007 | 13.31 | 1330.98 | 20.98 |
| 1244.5 | S | 10/01/2007 | 13.31 | 1264.43 | 19.93 |
| 65.5 | S | 10/01/2007 | 13.31 | 66.55 | 1.05 |
| 10480 | S | 10/01/2007 | 13.31 | 10647.84 | 167.84 |
| 13100 | S | 10/01/2007 | 13.21 | 13208.11 | 108.11 |
| 3275 | S | 10/01/2007 | 13.21 | 3302.03 | 27.03 |
| 7860 | S | 10/01/2007 | 13.21 | 7924.87 | 64.87 |
| 34722.99 | S | 10/01/2007 | 13.21 | 35001.5 | 278.51 |
| 3157.1 | S | 10/01/2007 | 13.21 | 3183.16 | 26.06 |
| 3392.9 | S | 10/01/2007 | 13.21 | 3421.34 | 28.44 |
| 17030 | S | 10/01/2007 | 13.24 | 17203.75 | 173.75 |
| 2620 | S | 10/01/2007 | 13.24 | 2647.96 | 27.96 |
| 7866.48 | S | 10/01/2007 | 13.24 | 7943.88 | 77.4 |
| 19666.2 | S | 10/01/2007 | 13.24 | 19859.7 | 193.5 |
| 15732.96 | S | 10/01/2007 | 13.24 | 15887.76 | 154.8 |
| 2622.16 | S | 10/01/2007 | 13.24 | 2647.96 | 25.8 |
| 85220.19 | S | 10/05/2007 | 13.45 | 87418.47 | 2198.28 |
| 9184 | S | 10/05/2007 | 13.45 | 9414.3 | 230.3 |
| 30438.4 | S | 10/05/2007 | 13.45 | 31201.67 | 763.27 |
| 2624 | S | 10/05/2007 | 13.45 | 2689.8 | 65.8 |
| 3673.6 | S | 10/05/2007 | 13.45 | 3765.72 | 92.12 |
| 1312 | S | 10/09/2007 | 13.45 | 1336.99 | 24.99 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 17056 | S | 10/09/2007 | 13.45 | 17484.73 | 428.73 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 6560 | S | 10/09/2007 | 13.45 | 6724.9 | 164.9 |

| | | | | | |
|---|---|---|---|---|---|
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 3936 | S | 10/09/2007 | 13.45 | 4034.94 | 98.94 |
| 262.4 | S | 10/09/2007 | 13.45 | 269 | 6.6 |
| 341.12 | S | 10/09/2007 | 13.45 | 349.69 | 8.57 |
| 708.48 | S | 10/09/2007 | 13.45 | 726.29 | 17.81 |
| 2624 | S | 10/09/2007 | 13.45 | 2689.96 | 65.96 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 1312 | S | 10/09/2007 | 13.45 | 1344.98 | 32.98 |
| 7872 | S | 10/09/2007 | 13.45 | 8069.88 | 197.88 |
| 9184 | S | 10/09/2007 | 13.4601 | 9417.62 | 233.62 |
| 7877.99 | S | 10/09/2007 | 13.4601 | 8072.25 | 194.26 |
| 1313 | S | 10/09/2007 | 13.46 | 1345.98 | 32.98 |
| 1313 | S | 10/09/2007 | 13.46 | 1345.98 | 32.98 |
| 1313.12 | S | 10/09/2007 | 13.46 | 1345.98 | 32.86 |
| 302.02 | S | 10/09/2007 | 13.46 | 309.58 | 7.56 |
| 1313.12 | S | 10/09/2007 | 13.46 | 1345.98 | 32.86 |
| 1313.12 | S | 10/09/2007 | 13.46 | 1345.98 | 32.86 |
| 19696.79 | S | 10/09/2007 | 13.46 | 20189.69 | 492.9 |
| 20707.89 | S | 10/09/2007 | 13.46 | 21226.1 | 518.21 |
| 1313.12 | S | 10/09/2007 | 13.46 | 1345.98 | 32.86 |
| 42019.82 | S | 10/09/2007 | 13.4601 | 43066.55 | 1046.73 |
| 23634 | S | 10/09/2007 | 13.4601 | 24224.93 | 590.93 |

-179341.06